**IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
VIRGINIA
Norfolk Division**

STACEY MAZOR,

     Plaintiff,

v.

MOVEMENT MORTGAGE, LLC

     Serve:

     Registered Agent
     Corporation Service Company
     508 Meeting Street
     West Columbia, South Carolina 29169


     Serve:

     Registered Agent
     Corporation Service Company
     100 Shockoe Slip, Floor 2
     Richmond, Virginia 23219

     Defendant.

Civil Action No.: 2:21-cv-00629

**COMPLAINT** – ADA,
Discrimination, Retaliation;
Title VII, Discrimination,
Retaliation; VHRA,
Discrimination; Va. Code
§40.1-27.3, Retaliation

**Jury Trial Demanded**

## COMPLAINT

Comes now the Plaintiff, STACEY MAZOR (hereinafter "Plaintiff" or "Ms. Mazor"),

and files this Complaint against Defendant, MOVEMENT MORTGAGE, LLC (hereinafter

"Defendant" or "Movement"), and moves this Court for entry of judgement in her favor against

the Defendant, as set forth herein:

## NATURE OF THE ACTION

1.     Plaintiff brings this action for damages and injunctive relief pursuant to the

Defendant's violations of the Americans with Disabilities Act, 42 U.S.C. §§12101 *et seq.*("ADA"); Title VII, 42 U.S.C. §§ 2000e *et seq.*("Title VII"); the Virginia Human Rights Act, Va. Code §2.2-3900 *et seq.*("VHRA"), and Virginia Code 40.1-27.3 to redress Defendant's deliberate and willfull unlawful employment discrimination and retaliation against Plaintiff in violation of her state and federal rights.

2. This action against Movement arises from Defendant's unlawful discrimination against Ms. Mazor on account of her disability and sex; as well as retaliation against Ms. Mazor on account of her engaging in a protected activity.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1331, the Eastern District of Virginia has proper subject matter jurisdiction over this matter as it is a question of federal law.

4. Specifically, this matter concerns the violation and interpretation of the ADA, 42 U.S.C. §§12101 *et seq.* and Title VII, 42 U.S.C. §§2000e *et seq.*

5. The Eastern District of Virginia, Norfolk Division is the proper venue for this action pursuant to 28 U.S.C. § 1391(c)(2) and 28 U.S.C. § 1391(b)(1),(2) as it is the District and Division in which the Defendant's discriminatory practices were perpetrated, where the Plaintiff was employed by Defendant, and is convenient to the parties and witnesses.

## PARTIES TO THIS ACTION

6. Plaintiff, Stacey Mazor, is an American citizen in the United States and a resident of Currituck, North Carolina.

7. Ms. Mazor was an employee of Defendant from March 2013 to July 22, 2020.

8. Ms. Mazor was in the hiring process to be an Appraisal Underwriter at Movement from August 2020 until October 23, 2020.

9.    Defendant, Movement Mortgage, LLC., is a limited liability company existing under and by virtue of the laws of the Commonwealth of Virginia and transacting business within the Commonwealth of Virginia, organized in Delaware, with its principal place of business in South Carolina, which employed Plaintiff in Virginia.

10.   Defendant employs approximately four thousand (4000) employees and is an employer as defined by the ADA; 42 U.S.C. § 12111(5)(A); Title VII, 42 U.S.C. § 2000e(b); and the VHRA, Va. Code § 2.2-3905.

## PROCEDURAL REQUIREMENTS

11.   On December 7, 2020, Plaintiff filed a charge of sex and disability discrimination in violation of the Title VII, the ADA, and the VHRA with the Equal Employment Opportunity Commission ("EEOC"). Such charge was filed within one hundred eighty (180) days after the alleged unlawful employment practices in violation of 42 U.S.C. §§ 2000e *et seq.* and 42 U.S.C. §§ 12101 *et seq.*., occurred.

12.   Plaintiff's claims under the VHRA are considered simultaneously filed with the Virginia Department of Human Rights when filed with the EEOC, per the work sharing agreement between the EEOC and Virginia Department of Human Rights.

13.   On January 18, 2021, Plaintiff filed a supplemental charge with the EEOC for retaliation in violation of the ADA, the VHRA, and Title VII. Such supplemental charge was filed within one hundred eighty (180) days after the alleged unlawful employment practices in violation of the ADA, Title VII, and the VHRA occurred.

14.   The EEOC issued Ms. Mazor her Notice of Dismissal and Right to Sue on August 30, 2021 (See **Exhibit A** – Notice of Dismissal and Right to Sue).

15.     Ms. Mazor has complied with Title VII, the ADA, and the VHRA administrative

        requirements and, having met her procedural and administrative deadlines, has elected to

        bring this action privately.

16.     Ms. Mazor has exhausted all available administrative remedies prior to bringing this suit.

**<u>FACTUAL ALLEGATIONS</u>**

17.     Ms. Mazor is a female and a disabled individual.

18.     Ms. Mazor, from March 2013 until her termination on July 22, 2020, was employed by

        Defendant at 824 N. Military Highway, Ste. 100, Norfolk, Virginia as an Appraisal

        Underwriter.

19.     Ms. Mazor was effective and efficient at her position.

20.     Ms. Mazor enjoyed her work and position at Movement.

21.     Ms. Mazor never received any disciplinary marks or negative performance reviews at

        Movement.

22.     Ms. Mazor was regularly responsible for review and correction of other employees'

        work, including her own superiors.

23.     Ms. Mazor, in her position, regularly saved Movement money and improved their

        services.

24.     While working at Movement as an appraisal underwriter, Ms. Mazor was diagnosed with

        dystonic disorder and chronic depression by her psychiatrist.

25.     Ms. Mazor's disability has negatively interactions with her family, her mental health, and

        her overall wellbeing, specifically, Ms. Mazor would have severe energy depletion, Ms.

        Mazor would be unable to wake up in the morning, she would lack the energy to

        participate in household tasks which impacted her ability to take care of her family.

26.   Ms. Mazor's disability severely impacted her mental health and would make it difficult for her to make and maintain regular relationships, as well as impacting her ability to care for herself through preparing food, cleaning, and even getting out of bed.

27.   Ms. Mazor was diagnosed with these conditions in September 2013.

28.   Ms. Mazor informed Movement of her diagnosis in 2013 and Movement was aware of her disability from that time onward.

29.   Ms. Mazor operated for seven years with this qualified disability.

30.   Even with her disability Ms. Mazor was capable of performing the essential functions of her position.

31.   Ms. Mazor's essential functions were to train employees, working with other departments to facilitate operations at Movement, manage staff, and resolving conflicts and escalations between staff.

32.   There was no substantial change in her performance from 2013 to 2020.

33.   In March 2020, Movement sent all of its employees to work entirely from home on account of COVID-19.

34.   Ms. Mazor had requested that Movement allow her the reasonable accommodation of modifying her schedule or continuing to work from the office when they had directed all employees to telework.

35.   Movement denied Ms. Mazor's request and did not even permit her to work part time from the office.

36.   Ms. Mazor requested to work from the office on account of her diagnosed depression, which was exacerbated when working from home.

37.   Ms. Mazor did not face this issue prior to March 2020.

38.     Ms. Mazor could have continued to perform her essential functions with a reasonable accommodation, as she had for the seven years prior to March 2020.

39.     Other than the location of her work, none of Ms. Mazor's essential functions, nor her ability to perform her essential functions had changed in March 2020.

40.     Ms. Mazor's request could have been fulfilled by Movement, as she had worked from her office before.

41.     Ms. Mazor's home and work spaces were accordingly merged by Movement's failure to accommodate her disability, which was worsened by this loss of boundary.

42.     In April, 2020, due to Movement's failure to provide any accommodations leading to accelerating stress levels at home and around her, Ms. Mazor was forced to take a medical leave from Movement.

43.     Ms. Mazor began her medical leave on April 25, 2020. Ms. Mazor informed Movement of her need for leave at the time and was granted leave with a guarantee of her return when cleared by her doctors.

44.     During Ms. Mazor's leave from Movement she was to keep Movement appraised of when doctor's appointments happened and provide updates for her return to work.

45.     Ms. Mazor maintained her end of this agreement from April 2020, when her leave began, through to the end of her employment.

46.     Movement, for three months, continued to abide by the terms of Ms. Mazor's leave of absence.

47.     Ms. Mazor continued to notify Movement, through her supervisor Christina Busby ("Ms. Busby"), of her doctor's appointments and any updates on when she would return to work.

48.  On the week of July 16, 2020, Ms. Mazor's doctor had canceled her appointment.

49.  Ms. Mazor contacted Ms. Busby and informed her that she was still not able to return to work, per her doctor's instructions. (See **Exhibit B** - Email Between Ms. Mazor and Ms. Busby).

50.  On the following Monday, July 20, 2020, Movement, through Ms. Busby, marked Ms. Mazor absent without cause—despite Ms. Mazor's previous communication with Ms. Busby.

51.  Movement marked Ms. Mazor absent without cause on Tuesday, July 21, 2020 and Wednesday, July 22, 2020, once again, despite being notified by Ms. Mazor that her leave would need to be extended until she saw her doctor.

52.  On July 22, 2020, Movement terminated Ms. Mazor's employment.

53.  Ms. Mazor had informed Movement, on the Thursday prior, that she would remain out on Monday, Tuesday, and Wednesday pursuant to her doctor's orders. Nothing had changed between the week of July 20 and the week of July 13 when she was not marked absent.

54.  Ms. Mazor was never notified that she was being marked absent without cause on Monday, Tuesday, or Wednesday.

55.  Ms. Busby texted Ms. Mazor on July 21, 2020 and still neglected to inform Ms. Mazor that she was being, and had been, marked absent without leave. (See **Exhibit C** – Texts between Ms. Mazor and Ms. Busby).

56.  Movement, through Ms. Busby, executed this plan to ensure Ms. Mazor's termination because they wanted to rid themselves of a disabled individual—despite her proven ability to perform her functions, which were established over the preceding seven years of her employment.

57. Ms. Mazor had Paid Time Off ("PTO") remaining at the time that she was terminated.

58. Had she been notified of her absent without leave marks, Ms. Mazor could have utilized these days to prevent being counted absent without leave.

59. Ms. Mazor, a qualified disabled individual, was taking absence from work pursuant to the understanding between herself and Movement.

60. Ms. Mazor was terminated from Movement despite complying with the strictures they put on her absence.

61. Ms. Mazor was terminated while on disability leave for being absent without leave, despite having PTO to cover those absences.

62. Other non-disabled employees working for Movement at the same location, with the same duties, and under the same management, were allowed to take absences and use PTO to cover those absences without being marked absent without leave.

63. Other non-disabled employees working for movement were allowed to take absences and cover those absences with PTO without being terminated.

64. Ms. Mazor was terminated for absences without leave despite having PTO to cover those absences on account of her disability.

65. Ms. Mazor was treated less favorably than male comparable employees on account of her sex.

66. A male employee Mr. Daniel Hines ("Mr. Hines"), was under similar strictures while absent with a medical condition.

67. Mr. Hines worked out of the same location as Ms. Mazor, 824 N. Military Hwy STE 100 Norfolk, Virginia.

68.  Mr. Hines had similar duties to Ms. Mazor and worked under the same managing
     authorities.

69.  Mr. Hines, was absent significantly longer than Ms. Mazor.

70.  Mr. Hines was asked to check in with his status in the same way that Ms. Mazor was.

71.  Mr. Hines was never marked absent without leave.

72.  Mr. Hines was not terminated while he was on his leave.

73.  The only difference between Ms. Mazor's leave and Ms. Hines was that Ms. Mazor is a
     woman.

74.  Movement's termination of Ms. Mazor was wrongfull and deliberate.

75.  Movement intentionally failed to notify Ms. Mazor that she was being marked absent
     without leave so that she could not use her time off to cover those days.

76.  Movement intentionally terminated Ms. Mazor for taking leave while allowing a
     similarly situated male employee, Mr. Hines to return to work after an absence similar to
     Ms. Mazor's.

77.  Ms. Mazor believed and continues to believe that she was terminated on account of her
     sex and disability, both of which were known to her supervisors at Movement.

78.  Following her termination, Ms. Mazor attempted to revive her employment with
     Movement, as she was a dedicated and model employee.

79.  In August 2020, Ms. Mazor contacted the owner of Movement, Mr. Casey Crawford
     ("Mr. Crawford) to ask for his assistance being reinstated after Ms. Mazor saw the
     position posted online.

80.  Mr. Crawford told her "they would find a way to bring her back in."

81.  The application-hiring process advanced, and Ms. Mazor was forwarded to Mr. Mike Brennan ("Mr. Brennan")—the Vice President of Movement—for final confirmation and rehiring.

82.  Ms. Mazor, for three months from August to October 23, 2020, was under the impression—given by officers of Movement—that she would be rehired for her old position.

83.  In October 2020, Ms. Mazor reached out to Mr. Brennan again and he informed her that Movement would rehire her but that they were just trying to find the spot to put her.

84.  Relying on this information and understanding, Ms. Mazor did not apply for new positions at that time, for fear it would jeopardize her ability to be rehired at Movement.

85.  Following her Termination, Ms. Mazor had contacted the EEOC and initiated the process of filing a formal charge for discrimination on account of sex and disability.

86.  Ms. Mazor was speaking with EEOC intake officers and participating in the intake process in the months following her termination.

87.  At the same time, Movement was in the midst of rehiring Ms. Mazor.

88.  In order to be transparent with Movement prior to coming back, Ms. Mazor informed Mr. Crawford and Mr. Brennan, that she had initiated a charge of discrimination with the EEOC in August following her termination.

89.  Movement immediately retaliated against Ms. Mazor in violation of her rights.

90.  On October 23, 2020, less than a month after being told by Ms. Mazor about her EEOC filings, Mr. Brennan, on behalf of Movement, ended Ms. Mazor's hiring and told her that they were not going to bring her back.

91.     This decision was in stark contrast to the information and communications that Movement had given Ms. Mazor prior to learning that she was participating in the EEOC process.

92.     Immediately following this notification, Mr. Brennan ceased contact with Ms. Mazor.

93.     Shortly thereafter, Ms. Mazor noticed that her old position was still on Indeed, as Movement continued to seek a replacement for her.

94.     Ms. Mazor was qualified for the position that she was being rehired for—she had performed in that position for seven years before her termination.

95.     Ms. Mazor was told multiple times by Mr. Brennan that she was being hired by Movement.

96.     The only reason Ms. Mazor's reemployment process was ended was on account of her filing with the EEOC in August, which Movement had notice of in October through Mr. Brennan.

97.     Movement, in retaliation for Ms. Mazor's engagement in a protected activity—initiating an EEOC charge—took an adverse action against her by preemptively ending her hiring process.

98.     Ms. Mazor applied for new work and obtained a position in October with MLD, Inc. d/b/a The Money Store located at 30 Vreeland Road, Florham Park, New Jersey ("MLD").

99.     Movement discovered that Ms. Mazor had applied for and received a position at MLD shorty after.

100.    Movement took efforts to sabotage Ms. Mazor's employment with MLD.

101.   On December 4, 2020, Movement sent a "cease and desist" letter to Ms. Mazor and MLD, alleging false statements insinuating that Ms. Mazor was attempting to get other Movement employees to quit in an attempt to have Ms. Mazor terminated. (See **Exhibit D** – Retaliatory Letter from Movement)

102.   Ms. Mazor was told by Blair Allen, a legal assistant for Defendant in South Carolina, that they would send this letter immediately to her employer.

103.   Movement did send this threatening letter to MLD.

104.   Movement sent this letter to Ms. Mazor to threaten and frighten her in retaliation for her filing an EEOC charge.

105.   Movement sent this letter to MLD to encourage them to end Ms. Mazor's employment with MLD in retaliation for Ms. Mazor filing an EEOC charge.

106.   This letter is false on its face and issued only with the intent to harass Ms. Mazor and threaten her position with her new employer.

107.   Movement was not content to simply end their relationship with Ms. Mazor because of her engagement in a protected activity, they took steps to damage her ability to have a relationship with her current employer as well.

108.   Movement discriminated against Ms. Mazor's federal and state statutory rights by terminating her on account of her disability and sex.

109.   Ms. Mazor, exercising her rights under federal and state law, began the process of filing with the EEOC—by meeting with an intake officer—in August 2020.

110.   Movement retaliated against Ms. Mazor for engaging in this protected activity by ending her hiring process (which she was months into) and by issuing a cease and desist letter to damage her relationship with MLD.

111.    Ms. Mazor lost months of salary; has a lower income than before; and—given her

disability—has suffered substantial emotional stress and harm on account of Movement's

discrimination and retaliation against her.

## COUNT I: TITLE VII SEX DISCRIMINATION

112.    Plaintiff reasserts and affirms the statements made in paragraphs 1-112.

113.    Plaintiff was employed by Defendant from March 2013 until July 22, 2020.

114.    Plaintiff worked for Defendant for seven years prior to her termination and had never

received any negative reviews.

115.    Plaintiff had received regular raises while working for the Defendant.

116.    Plaintiff was so effective at her position that she was regularly asked to review work of

her superiors and correct it.

117.    Plaintiff was out on leave—pursuant to an agreement with Defendant—from April 25,

2020 until her termination.

118.    Plaintiff maintained her responsibilities as required by this leave until her termination.

119.    Plaintiff kept Defendant notified of her return status and doctor's appointements

throughout her time on leave.

120.    At the time that Plaintiff was terminated she had informed Defendant of her ongoing

leave status.

121.    At the time Plaintiff was terminated, Plaintiff had paid time off and sick leave days

remaining in her balance.

122.    Plaintiff informed Ms. Busby—her supervisor at Movement—that she would be absent

pursuant to her doctor's orders the week of July 20-25.

123.   Ms. Busby, on behalf of Defendant, marked Plaintiff absent without leave on July 20, 21, and 22.

124.   Defendant did not inform Plaintiff that she was being marked abasent without leave on July 20, 21, or 22.

125.   Plaintiff was terminated by Defendant on July 22, 2020.

126.   Plaintiff was never given the opportunity to use her PTO and sick leave days to account for the absences.

127.   Plaintiff was marked absent despite complying with the terms of her leave agreement with Defendant.

128.   Mr. Hines, a male employee at Defendant was on similar long term leave.

129.   Mr. Hines was subject to the same conditions of his leave that Plaintiff was.

130.   Mr. Hines notified Defendant of his doctor's orders in the same fashion that Plaintiff did.

131.   Mr. Hines was never marked absent without leave while on his leave from Defendant.

132.   Mr. Hines was never terminated from Defendant while on his leave.

133.   Mr. Hines performed similar functions, under the same management, and in the same location as Plaintiff.

134.   Plaintiff was terminated while on leave on account of her sex, while similarly situated male employees, specifically Mr. Hines, were not terminated.

135.   Defendant willfully violated Title VII by terminating Plaintiff on account of her sex.

136.   Plaintiff has suffered significant financial impact, emotional damage, and ongoing loss of income, benefits, and enjoyment as a result of Defendant's discriminatory termination.

## COUNT II: VHRA SEX DISCRIMINATION

137.   Plaintiff reasserts and affirms the statements made in paragraphs 1-136.

138.   Plaintiff was employed by Defendant from March 2013 until July 22, 2020.

139.   Plaintiff worked for Defendant for seven years prior to her termination and had never received any negative reviews.

140.   Plaintiff had received regular raises while working for the Defendant.

141.   Plaintiff was so effective at her position that she was regularly asked to review work of her superiors and correct it.

142.   Plaintiff was out on leave—pursuant to an agreement with Defendant—from April 25, 2020 until her termination.

143.   Plaintiff maintained her responsibilities as required by this leave until her termination.

144.   Plaintiff kept Defendant notified of her return status and doctor's appointements throughout her time on leave.

145.   At the time that Plaintiff was terminated she had informed Defendant of her ongoing leave status.

146.   At the time Plaintiff was terminated, Plaintiff had paid time off and sick leave days remaining in her balance.

147.   Plaintiff informed Ms. Busby—her supervisor at Movement—that she would be absent pursuant to her doctor's orders the week of July 20-25.

148.   Ms. Busby, on behalf of Defendant, marked Plaintiff absent without leave on July 20, 21, and 22.

149.   Defendant did not inform Plaintiff that she was being marked abasent without leave on July 20, 21, or 22.

150.   Plaintiff was terminated by Defendant on July 22, 2020.

151.   Plaintiff was never given the opportunity to use her PTO and sick leave days to account for the absences.

152.   Plaintiff was marked absent despite complying with the terms of her leave agreement with Defendant.

153.   Mr. Hines, a male employee at Defendant was on similar long term leave.

154.   Mr. Hines was subject to the same conditions of his leave that Plaintiff was.

155.   Mr. Hines notified Defendant of his doctor's orders in the same fashion that Plaintiff did.

156.   Mr. Hines was never marked absent without leave while on his leave from Defendant.

157.   Mr. Hines was never terminated from Defendant while on his leave.

158.   Mr. Hines performed similar functions, under the same management, and in the same location as Plaintiff.

159.   Plaintiff was terminated while on leave on account of her sex, while similarly situated male employees, specifically Mr. Hines, were not terminated.

160.   Defendant willfully violated the VHRA by terminating Plaintiff on account of her sex.

161.   Plaintiff has suffered significant financial impact, emotional damage, and ongoing loss of income, benefits, and enjoyment as a result of Defendant's discriminatory termination.

## COUNT III: ADA DISABILITY DISCRIMINATION BY FAILING TO REASONABLY ACCOMMODATE

162.   Plaintiff reasserts and affirms the statements made in paragraphs 1-161.

163.   Plaintiff was a qualified disabled individual.

164.   Plaintiff was diagnosed with dysthymic disorder and chronic depression by her psychiatrist in 2013.

165. Plaintiff's dysthymic disorder and chronic depression caused her anxiety, fibro mialga, and excessive fatigue.

166. Ms. Mazor's disability has negatively interactions with her family, her mental health, and her overall wellbeing, specifically, Ms. Mazor would have severe energy depletion, Ms. Mazor would be unable to wake up in the morning, she would lack the energy to participate in household tasks which impacted her ability to take care of her family.

167. Ms. Mazor's disability severely impacted her mental health and would make it difficult for her to make and maintain regular relationships, as well as impacting her ability to care for herself through preparing food, cleaning, and even getting out of bed.

168. Nonetheless, Plaintiff was able to perform the essential functions of her position with her distonic disorder and chronic depression sufficient to be employed for seven years, receive raises and bonuses, positive performance reviews, and to oversee and correc the work of her superiors at Defendant.

169. Defendant was aware of Plaintiff's disability, limitations, and effectiveness, as Plaintiff had alerted Defendant of her disability when she was hired.

170. In March 2020, Defendant sent all of its employees to work from home at the onset of the COVID emergency.

171. Plaintiff requested reasonable accommodation in the form of a modified schedule or working from the office at least part of the time.

172. Plaintiff could perform the functions of her position from the office if this allowance had been provided, as she had done so for nearly seven years prior.

173. Plaintiff would not have been the only individual in the office if Defendant had granted this accommodation.

174.   It would not have been an undue burden on Defendant to provide this accommodation, as it had employed Plaintiff from the office for the entirety of her tenure.

175.   Plaintiff's disability was exacerbated by working from home, as the Plaintiff's work and home worlds merged.

176.   Defendant failed to engage in the interactive process and denied Plaintiff reasonable accommodations to account for her disability after the COVID induced changed in work circumstances.

177.   Plaintiff's conditions worsened as a result of Defendant's failure to provide this—or any other—accommodation and she had to take medical leave.

178.   Defendant, despite knowledge of Plaintiff's disability and the ADA's prohibitions against discrimination, willfully discriminated against Plaintiff by failing to provide reasonable accommodations.

## COUNT IV: VHRA DISABILITY DISCRIMINATION BY FAILING TO REASONABLY ACCOMMODATE

179.   Plaintiff reasserts and affirms the statements made in paragraphs 1-178.

180.   Plaintiff was a qualified disabled individual.

181.   Plaintiff was diagnosed with dysthymic disorder and chronic depression by her psychiatrist in 2013.

182.   Plaintiff's dysthymic disorder and chronic depression caused her anxiety, fibro mialga, and excessive fatigue.

183.   Ms. Mazor's disability has negatively interactions with her family, her mental health, and her overall wellbeing, specifically, Ms. Mazor would have severe energy depletion, Ms. Mazor would be unable to wake up in the morning, she would lack the energy to participate in household tasks which impacted her ability to take care of her family.

184. Ms. Mazor's disability severely impacted her mental health and would make it difficult for her to make and maintain regular relationships, as well as impacting her ability to care for herself through preparing food, cleaning, and even getting out of bed.

185. Nonetheless, Plaintiff was able to perform the essential functions of her position with her distonic disorder and chronic depression sufficient to be employed for seven years, receive raises and bonuses, positive performance reviews, and to oversee and correc the work of her superiors at Defendant.

186. Defendant was aware of Plaintiff's disability, limitations, and effectiveness, as Plaintiff had alerted Defendant of her disability when she was hired.

187. In March 2020, Defendant sent all of its employees to work from home at the onset of the COVID emergency.

188. Plaintiff requested reasonable accommodation in the form of a modified schedule or working from the office at least part of the time.

189. Plaintiff could perform the functions of her position from the office if this allowance had been provided, as she had done so for nearly seven years prior.

190. Plaintiff would not have been the only individual in the office if Defendant had granted this accommodation.

191. It would not have been an undue burden on Defendant to provide this accommodation, as it had employed Plaintiff from the office for the entirety of her tenure.

192. Plaintiff's disability was exacerbated by working from home, as the Plaintiff's work and home worlds merged.

193.   Defendant failed to engage in the interactive process and denied Plaintiff reasonable accommodations to account for her disability after the COVID induced changed in work circumstances.

194.   Plaintiff's conditions worsened as a result of Defendant's failure to provide this—or any other—accommodation and she had to take medical leave.

195.   Defendant, despite knowledge of Plaintiff's disability and the VHRA's prohibitions against discrimination, willfully discriminated against Plaintiff by failing to provide reasonable accommodations.

## COUNT V: ADA DISCRIMINATION THROUGH TERMINATION

196.   Plaintiff reasserts and affirms the statements made in paragraphs 1-196.

197.   Plaintiff was employed by Defendant from March 2013 until July 22, 2020.

198.   Plaintiff worked for Defendant for seven years prior to her termination and had never received any negative reviews.

199.   Plaintiff had received regular raises while working for the Defendant.

200.   Plaintiff was a qualified disabled individual at all times relevant to this complaint.

201.   Plaintiff was diagnosed with dysthymic disorder and chronic depression by her psychiatrist in 2013.

202.   Plaintiff's dysthymic disorder and chronic depression caused her anxiety, fibro mialga, and excessive fatigue.

203.   Ms. Mazor's disability has negatively interactions with her family, her mental health, and her overall wellbeing, specifically, Ms. Mazor would have severe energy depletion, Ms. Mazor would be unable to wake up in the morning, she would lack the energy to participate in household tasks which impacted her ability to take care of her family.

204.   Ms. Mazor's disability severely impacted her mental health and would make it difficult for her to make and maintain regular relationships, as well as impacting her ability to care for herself through preparing food, cleaning, and even getting out of bed.

205.   Nonetheless, Plaintiff was able to perform the essential functions of her position with her distonic disorder and chronic depression sufficient to be employed for seven years, receive raises and bonuses, positive performance reviews, and to oversee and correc the work of her superiors at Defendant.

206.   Defendant was aware of Plaintiff's disability, limitations, and effectiveness, as Plaintiff had alerted Defendant of her disability when she was hired.

207.   Plaintiff was so effective at her position that she was regularly asked to review work of her superiors and correct it.

208.   Plaintiff was out on leave—pursuant to an agreement with Defendant—from April 25, 2020 until her termination.

209.   Plaintiff maintained her responsibilities as required by this leave until her termination.

210.   Plaintiff kept Defendant notified of her return status and doctor's appointements throughout her time on leave.

211.   At the time that Plaintiff was terminated she had informed Defendant of her ongoing leave status.

212.   At the time Plaintiff was terminated, Plaintiff had PTO remaining to be used.

213.   Plaintiff informed Ms. Busby—her supervisor at Movement—that she would be absent pursuant to her doctor's orders the week of July 20-25.

214.   Ms. Busby, on behalf of Defendant, marked Plaintiff absent without leave on July 20, 21, and 22.

215.   Defendant did not inform Plaintiff that she was being marked absent without leave on July 20, 21, or 22.

216.   Plaintiff was terminated by Defendant on July 22, 2020.

217.   Plaintiff was never given the opportunity to use her PTO and sick leave days to account for the absences.

218.   Non disabled employees at Movement under the same management and with the same duties as Plaintiff were allowed to use PTO to cover absent days without being marked absent without leave.

219.   Non disabled employees at Movement under the same management and with the same duties as Plaintiff were allowed to use PTO to cover absent days without being terminated for absences.

220.   Plaintiff was marked absent despite complying with the terms of her leave agreement with Defendant.

221.   Plaintiff was terminated while on disability leave, despite complying with the requirements of Defendant while on that leave.

222.   Plaintiff was terminated on account of her disability.

223.   Plaintiff has suffered significant financial impact, emotional damage, and ongoing loss of income, benefits, and enjoyment as a result of Defendant's discriminatory termination.

## COUNT VI : VHRA DISABILITY DISCRIMINATION THROUGH TERMINATION

224.   Plaintiff reasserts and affirms the statements made in paragraphs 1-223.

225.   Plaintiff was employed by Defendant from March 2013 until July 22, 2020.

226.   Plaintiff worked for Defendant for seven years prior to her termination and had never received any negative reviews.

227.  Plaintiff had received regular raises while working for the Defendant.

228.  Plaintiff was a qualified disabled individual at all times relevant to this complaint.

229.  Plaintiff was diagnosed with dysthymic disorder and chronic depression by her psychiatrist in 2013.

230.  Plaintiff's dysthymic disorder and chronic depression caused her anxiety, fibro mialga, and excessive fatigue.

231.  Ms. Mazor's disability has negatively interactions with her family, her mental health, and her overall wellbeing, specifically, Ms. Mazor would have severe energy depletion, Ms. Mazor would be unable to wake up in the morning, she would lack the energy to participate in household tasks which impacted her ability to take care of her family.

232.  Ms. Mazor's disability severely impacted her mental health and would make it difficult for her to make and maintain regular relationships, as well as impacting her ability to care for herself through preparing food, cleaning, and even getting out of bed.

233.  Nonetheless, Plaintiff was able to perform the essential functions of her position with her distonic disorder and chronic depression sufficient to be employed for seven years, receive raises and bonuses, positive performance reviews, and to oversee and correc the work of her superiors at Defendant.

234.  Defendant was aware of Plaintiff's disability, limitations, and effectiveness, as Plaintiff had alerted Defendant of her disability when she was hired.

235.  Plaintiff was so effective at her position that she was regularly asked to review work of her superiors and correct it.

236.  Plaintiff was out on leave—pursuant to an agreement with Defendant—from April 25, 2020 until her termination.

237. Plaintiff maintained her responsibilities as required by this leave until her termination.

238. Plaintiff kept Defendant notified of her return status and doctor's appointements throughout her time on leave.

239. At the time that Plaintiff was terminated she had informed Defendant of her ongoing leave status.

240. At the time Plaintiff was terminated, Plaintiff had PTO remaining to be used.

241. Plaintiff informed Ms. Busby—her supervisor at Movement—that she would be absent pursuant to her doctor's orders the week of July 20-25.

242. Ms. Busby, on behalf of Defendant, marked Plaintiff absent without leave on July 20, 21, and 22.

243. Defendant did not inform Plaintiff that she was being marked abasent without leave on July 20, 21, or 22.

244. Plaintiff was terminated by Defendant on July 22, 2020.

245. Plaintiff was never given the opportunity to use her PTO and sick leave days to account for the absences.

246. Non disabled employees at Movement under the same management and with the same duties as Plaintiff were allowed to use PTO to cover absent days without being marked absent without leave.

247. Non disabled employees at Movement under the same management and with the same duties as Plaintiff were allowed to use PTO to cover absent days without being terminated for absences.

248. Plaintiff was marked absent despite complying with the terms of her leave agreement with Defendant.

249.    Plaintiff was terminated while on disability leave, despite complying with the requirements of Defendant while on that leave.

250.    Plaintiff was terminated on account of her disability.

251.    Plaintiff has suffered significant financial impact, emotional damage, and ongoing loss of income, benefits, and enjoyment as a result of Defendant's discriminatory termination.

## COUNT VII: ADA RETALIATION

252.    Plaintiff reasserts and affirms the statements made in paragraphs 1-251.

253.    Plaintiff engaged in a protected activity.

254.    Plaintiff was participating in the process of investigating claims of disability discrimination under the ADA by intiating and charge and meeting with intake personnel at the EEOC in August 2020.

255.    Plaintiff was filing claims under the ADA for conduct that was discriminatory and that she believed to be discriminatory.

256.    While initiating process with the EEOC, Plaintiff was simultaneously applying for rehire with Defendant.

257.    Agents of Defendant, Ms. Crawford and Mr. Brennan, had informed Plaintiff that she would be rehired by Defendant, and that the process was merely time related for her return.

258.    During this process in October, and after Plaintiff had been told by Movement she would be given the position, Plaintiff informed Mr. Crawford and Mr. Brennan that she had initated and participated in a charge in the EEOC for Movement's prior ADA discrimination.

259.    Mr. Brennan passed this information on to other supervisors and managers at Movement.

260. Immediately after, Mr. Brennan informed Plaintiff that Movement would not be hiring her.

261. In October, after Plaintiff informed Mr. Crawford of her filing, agents of Movement, including Mr. Crawford and Mr. Brennan stopped communicating with Plaintiff.

262. Shortly thereafter, the position for which Plaintiff was applying—and which she had previously been told she would receive—remained on Indeed.

263. Plaintiff, told she was no longer being hired for the position, found new employment at MLD.

264. On December 4, 2020, Plaintiff was sent a harassing letter by Movement that was telling her to "cease and desist" actions that she was not taking.

265. Movement sent this harassing letter to Plaintiff's new employer in an effort to have Plaintiff terminated from her new employer.

266. Movement cease Plaintiff's hiring and sent a letter to Plaintiff and MLD in order to retaliate against Plaintiff on account of engaging in the EEOC process relative to her claims of disability discrimination.

## COUNT VIII: TITLE VII RETALIATION

267. Plaintiff reasserts and affirms the statements made in paragraphs 1-266.

268. Plaintiff engaged in a protected activity.

269. Plaintiff was participating in the process of investigating claims of sex discrimination under Title VII by intiating and charge and meeting with intake personnel at the EEOC in August 2020.

270. Plaintiff was filing claims under Title VII for conduct that was discriminatory and that she believed to be discriminatory.

271.    While initiating process with the EEOC, Plaintiff was simultaneously applying for rehire with Defendant.

272.    Agents of Defendant, Mr. Crawford and Mr. Brennan, had informed Plaintiff that she would be rehired by Defendant, and that the process was merely time related for her return.

273.    During this process in October, and after Plaintiff had been told by Movement she would be given the position, Plaintiff informed Mr. Crawford and Mr. Brennan that she had initated and participated in a charge in the EEOC for Movement's prior Title VII sex discrimination.

274.    Mr. Brennan passed this information on to other supervisors and managers at Movement.

275.    Immediately after, Mr. Brennan informed Plaintiff that Movement would not be hiring her.

276.    In October, after Plaintiff informed Mr. Crawford of her filing, agents of Movement, including Mr. Crawford and Mr. Brennan stopped communicating with Plaintiff.

277.    Shortly thereafter, the position for which Plaintiff was applying—and which she had previously been told she would receive—was placed on Indeed by Movement.

278.    Plaintiff, told she was no longer being hired for the position, found new employment at MLD.

279.    On December 4, 2020, Plaintiff was sent a harassing letter by Movement that was telling her to "cease and desist" actions that she was not taking.

280.    Movement sent this harassing letter to Plaintiff's new employer in an effort to have Plaintiff terminated from her new employer.

281.   Movement cease Plaintiff's hiring and sent a letter to Plaintiff and MLD in order to retaliate against Plaintiff on account of engaging in the EEOC process relative to her claims of Title VII sex discrimination.

## COUNT IX: Virginia Code 40.1 RETALIATION

282.   Plaintiff reasserts and affirms the statements made in paragraphs 1-281.

283.   Virginia Code §40.1-27.3 prohibits employers from retaliating against employees for engaging in protected activities.

284.   Plaintiff engaged in a protected activity.

285.   Plaintiff was participating in the process of investigating claims of discrimination under the ADA, Title VII, and the VHRA by intiating and charge and meeting with intake personnel at the EEOC in August 2020.

286.   Plaintiff was filing claims under the ADA, VHRA, and Title VII for conduct that was discriminatory and that she believed to be discriminatory.

287.   While initiating process with the EEOC, Plaintiff was simultaneously applying for rehire with Defendant.

288.   Agents of Defendant, Mr. Crawford and Mr. Brennan, had informed Plaintiff that she would be rehired by Defendant, and that the process was merely time related for her return.

289.   During this process in October, and after Plaintiff had been told by Movement she would be given the position, Plaintiff informed Mr. Crawford that she had initated and participated in a charge in the EEOC for Movement's prior discrimination.

290.   Mr. Brennan passed this information on to other supervisors and managers at Movement.

291.  Immediately after, Mr. Brennan informed Plaintiff that Movement would not be hiring her.

292.  In October, after Plaintiff informed Mr. Crawford of her filing, agents of Movement, including Mr. Crawford and Mr. Brennan stopped communicating with Plaintiff.

293.  Shortly thereafter, the position for which Plaintiff was applying—and which she had previously been told she would receive—was placed on Indeed by Movement.

294.  Plaintiff, told she was no longer being hired for the position, found new employment at MLD.

295.  On December 4, 2020, Plaintiff was sent a harassing letter by Movement that was telling her to "cease and desist" actions that she was not taking.

296.  Movement sent this harassing letter to Plaintiff's new employer in an effort to have Plaintiff terminated from her new employer.

297.  Movement cease Plaintiff's hiring and sent a letter to Plaintiff and MLD in order to retaliate against Plaintiff on account of engaging in the EEOC process relative to her claims of discrimination.

## COUNT X: WRONGFUL TERMINATION IN CONTRAVENTION OF PUBLIC POLICY

298.  Plaintiff reasserts and affirms the statements made in paragraphs 1-297.

299.  Defendant terminated Plaintiff in violation of Virignia Public Policy.

300.  The Virginia Values Act, "VVA," enacted on July 1, 2020, makes unlawful discrimination against employees on account of age.[1]

301.  Virginia employers are prohibited, per the VVA, from terminating employees on account of age: "It is an **unlawful employment practice** for: An employer to: Fail or refuse to

---

[1] Virginia Code § 2.2-3905

29

hire, **discharge**, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, **sex**, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, status as a veteran, or national origin."[2]

302.   Plaintiff suffered termination on account of her sex as described in Counts I and III of this complaint

303.   Defendant terminated Plaintiff on July 22, 2020 on account of her sex.

304.   Defendant, by terminating Plaintiff on account of her sex, acted in contravention of stated Virginia Policy prohibiting sex discrimination in employment.

305.   The VVA specifically expands the definitions of and liability for, employment discrimination on account of sex, echoing federal employment statutes.

306.   The expansion of the Virginia Human Rights Act through the VVA prohibiting age discrimination in employment is a clear expression of Virginia Public Policy in opposition to age discrimination.

307.   By terminating the Plaintiff on account of her sex as described in Counts I and III of this Complaint the Defendant wrongfully terminated the Plaintiff in contravention of the public policy stated in the VVA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgement against the Defendant as follows:

---

[2] *Id*. (Emphasis added)

1. Appropriate declaratory relief declaring the acts and practices of Defendant to have been in violation of Ms. Mazor's rights as secured by the ADA, 42 U.S.C. § 12101, *et seq.*; Title VII 42 U.S.C. §2000e; and the VHRA, Virginia Code § 2.2-3606, *et seq.*

2. Permanently enjoin Defendant, its assigns, successor, agents, employees, and those acting in concert with them from engaging in discrimination against employees;

3. For appropriate actual damages against Defendant for violations of the ADA, Title VII, the VHRA, and Virginia Code 40.1-27.3 for discrimination and retaliation thereunder:

   a. $54,379 in Back Payment of Plaintiff's wages from the time of termination to present (calculated to date of filing); and further for backpayment of Plaintiff's from time of filing onward.

   b. $15,000 in Back Payment of scheduled bonuses and raises.

   c. $15,000 in Payment for loss of benefits such as health insurance, dental insurance, vision insurance, prescription insurance, accrued leave and other benefits of employment as a result of Plaintiff's wrongful termination.

4. For compensatory damages resulting from the wrongful discharge of Plaintiff in violation of public policy in amounts no less than $250,000 for stress, emotional distress, inconvenience, loss of enjoyment, humiliation, and loss of reputation;

5. For punitive damages in the amount of $350,000 for willful violation of Title VII under COUNT I of this Complaint;

6. For punitive damages in the amount of $350,000 for willful violation of the VHRA under COUNT II of this Complaint;

7. For punitive damages in the amount of $350,000 for punitive damages for willful violation of the ADA under COUNT III of this Complaint;

8. For punitive damages in the amount of $350,000 for punitive damages for willful violation of the VHRA under COUNT IV of this Complaint;

9. For punitive damages in the amount of $350,000 for punitive damages for willful violation of the ADA under COUNT V of this Complaint;

10. For punitive damages in the amount of $350,000 for punitive damages for willful violation of the VHRA under COUNT VI of this Complaint;

11. For punitive damages in the amount of $350,000 for punitive damages for willful violation of the ADA under COUNT VII of this Complaint;

12. For punitive damages in the amount of $350,000 for punitive damages for willful violation of the Title VII under COUNT VIII of this Complaint;

13. For punitive damages in the amount of $350,000 for punitive damages for wrongful termination in contravention of public policy as described under COUNT X of this Complaint;

14. For all other wages and benefits lost or denied;

15. For an award to Plaintiff of her reasonable attorney's fees, and costs incurred in this action, together with expert witness fees and expenses;

16. For an award of any additional amounts necessary to offset the adverse tax consequences of an award received in a lump sum;

17. For an award of pre-judgement and post-judgement interest on any monetary award; and

18. For an Order of any other relief this Court deems to be just and proper.

## **DEMAND FOR JURY TRIAL**

19. Ms. Mazor, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands a trial by jury in this action for all claims so triable.

Respectfully Submitted,

STACEY MAZOR

_____/s/_____
Brandon T. Bybee (VSB# 92140)
William B. Barteau (VSB# 93381)
BRANDON T. BYBEE, P.L.C.
208 E. Plume Street, Suite 327
Norfolk, VA 23510
Tel: (757) 568-0090
Fax: (866) 568-0090
brandon@bybeelegal.com
william@bybeelegal.com
*Counsel for Plaintiff*
